UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -v.- | : | 13 Cr. 268 (JMF) |
| ARTHUR AZEN, | : | |
| Defendant. | : | |

---------------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

                PREET BHARARA
                United States Attorney
                Southern District of New York
                Attorney for the United States of America

Joshua A. Naftalis
Harris M. Fischman
Kristy J. Greenberg
Peter Skinner
Assistant United States Attorneys
    - Of Counsel -



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 1, 2014

<u>BY ECF</u>

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square, Room 2202
New York, New York  10007

    Re: <u>United States</u> v. <u>Arthur Azen</u>,
       13 Cr. 268 (JMF)

Dear Judge Furman:

  The Government respectfully writes in advance of the defendant's sentencing, currently scheduled for April 9, 2014 at 2:15 p.m.

  <u>The Offense Conduct</u>

  *Money Laundering (Count Twelve)*

  The defendant laundered between $200,000 and $400,000 in proceeds from his own illegal gambling business — which included illegal sports gambling and poker — and from the illegal sports gambling business operated by Illya Trincher through a plumbing company in New York City, Titan P&H LLC.  PSR ¶ 29.[1]

  The defendant explained how he laundered some of the proceeds from his own illegal gambling business at his November 5, 2013 guilty plea:

> At various times between 2006 and 2013, I agreed with others to deposit money that I earned through illegal gambling into a plumbing company's account.  Then the company would write me a check for the same amount.  I did this in order to conceal proceeds from illegal gambling.  The plumbing company was located in the Bronx, and a portion of the funds were earned from illegal poker games in Manhattan.  At the time I did this, I knew it was wrong.

Tr. 20-21.

---

[1] "PSR" refers to the February 24, 2014 draft Pretrial Investigation Report prepared by the Probation Department.

The defendant also helped Illya Trincher launder money through Titan P&H LLC. In or about 2011, Illya Trincher acquired a fifty percent stake in Titan from co-defendant Peter Skyllas to cover a $2 million gambling debt that Skyllas owed to Trincher. Azen agreed to serve as a no-show employee at Titan and kick back a majority of his plumber salary to Azen in exchange for a fee. This arrangement had the following benefits to the participants: *First*, Azen earned thousands of dollars for doing nothing other than agreeing to have his name listed on tax returns of the company as an employee. *Second*, Trincher was able to take money out of Titan, under the seemingly legitimate means of an employee's salary. *Third*, Titan was able to list Azen as an employee and deduct his salary for tax purposes — thereby reducing the net taxable income.

The Federal Bureau of Investigation ("FBI") intercepted various phone calls regarding this money laundering arrangement pursuant to Title III wiretaps. For example, on September 28, 2012, Azen spoke to Skyllas about a debt Skyllas owed and about Azen's threatening to "quit" his "job" with Tian:

> SKYLLAS: Hey my brother.
>
> AZEN: Do me a favor, don't fucking brother me, man, you know you're a real piece of shit. I fucking come to your rescue, this fucking guy's gonna open your fucking head and this is how you fucking repay me, man?
>
> SKYLLAS: Brother, I told you, I talked to my partner.
>
> AZEN: I don't give a fuck what you told me. I'm getting fucking phone calls, I gotta meet the guy today. So what the fuck are you telling me?
>
> SKYLLAS: I'm getting mine Monday, he's giving it to me. Cause I already asked him he said he's just take it from another guy then I'm gonna give it to you. So he's gonna give it to me on Monday. I said. . .
>
> AZEN: I'm not fucking waiting till Monday, do you understand me? I gotta fucking see him today.
>
> SKYLLAS: See who today?
>
> AZEN: Whoever the fuck I see every month.
>
> SKYLLAS: That dickhead, Baldy?
>
> AZEN: Yeah
>
> SKYLLAS: Alright, let me call him right now, if he can give it to me today

>    AZEN:       I want it all today, do you understand?  I'm putting in my letter of termination, we're done man.
>
>    SKYLLAS:    Ok.
>
>    AZEN:       Make sure it gets taken care of today.
>
>    SKYLLAS:    I'll call...
>
>    [Call disconnected]

Thereafter, Azen's no-show relationship was renegotiated.

On or about September 30, 2012, Azen received a text message from co-defendant Donald McClamont, a poker player who was installed by Trincher as a financial officer of Titan in 2012.  The text message stated, "Illya wants to talk to you about your termination.  Please call him later tonight when good for you."

On or about October 2, 2012, Trincher spoke to Azen on the phone.  During that call, Trincher asked Azen why he no longer wanted to be listed as an employee of Titan: "the reason you are not doing the thing with the company, it's a personal thing, with him [Pete Skyllas]?"  Azen responded, "Absolutely personal, yes."  Trincher then asked if there were any conditions under which Azen would remain listed as an employee because it was beneficial for Trincher: "ok because it was like a good thing for me, let me think if I can help work it out . . . it helps me, it helps me, it helps me get im, the company owes me money, and it helps me get money out of the company, like I have been taking your money out of the company every week and the company is like, it helps me reduce my figure with Pete."  Azen responded, "I'd say the issue is, I found a better deal bro you know cause it's not only beneficial to me, it's also like you said, it's beneficial to you and more other ways than you guys understand, if you really break it down, its really beneficial."  Trincher responded, "hmmm no no 100 hundred percent, that's why I am calling actually."

Trincher and Azen then discussed the details of Azen's then-existing arrangement with Titan, whereby he was paid a salary of approximately $104,000 a year and then kicked all of that up to Trincher, except ten percent which Azen kept for himself.  Trincher said, "you're basically getting um a break, of what you give verses what you get, I see."  Azen responded, "yeah I get a ten percent break, yeah."  Trincher later said, "It certainly helps me out that's for sure.  Because you're the only money I have been taking out of the company, you know for that to stop, then I don't know what the fuck."  Azen responded, "If it works for you and you can match that deal, the only thing I am going to ask is, um I am going to need a raise, you know obviously you know everything."  Trincher responded, "So you're saying just a bigger amount . . ok, how much bigger percentage wise?"  Azen responded, "not much.  I mean I think we are at $104,000 a year right now, the offer that I have on the table right now is 120 so it's like 16, 16 to 20,000 a year more."

The next day, October 3, 2012, McCalmont sent a text message to Azen stating, "I was asked to give u the message that your terms are ok."

On or about October 4, 2012, Azen spoke to McCalmont on the phone and went over the terms of the new $120,000 per year "employment" deal. McCalmont asked, "are you comfortable talking on the phone?" McCalmont then said, "I going to give you 4 numbers that add up to 120, ok? 104 and then 10 which represents the taxes and fees that Titan pays, ok, on the 104, and then 3 which represents, um the amount of money that Titan contributes to your health insurance, and then another 3, which would represent a bonus that you would get at the end of the year to even out the number. So you got 104 plus 10 plus 3 plus 3, and those add up to 120."

On or about October 10, 2012, Azen spoke to Skyllas on the phone. During the conversation, Skyllas said, "I spoke to Illya . . . I don't want to say too much over the phone, but . . . is that correct or not correct?" Azen responded, "Yeah, he asked me to help him out . . . I said fine." Skyllas went on to say, "I just want to go over the terms and stuff . . . I don't want to do it over the phone, face to face, I want to make sure, we're on the same page in case I misunderstood him."

On or about October 25, 2012, Azen spoke on the phone with Skyllas. During the call, Azen stated, "the forms I am going to mail in through [sic] right?" Skyllas responded, "yeah email to Jessie and he can CC me or just make sure Jessie gets it. He does payroll in the office." The forms that they were discussing were the paperwork related to Azen's being on Titan's payroll.

On or about November 13, 2012, Azen again spoke to McCalmont on the phone. During the call, Azen stated, "You know how you get a letter in the mail each pay period, this time you should be getting a real check . . . because it takes a couple of pay periods before it kicks in." McCalmont responded, "So you should be getting a check in the mail probably today because it was mailed from the office in Brooklyn on Friday, in the Bronx on Friday."

*Conspiracy to Collect Extensions of Credit by*
*Extortionate Means (Count Nineteen)*

Arthur Azen, along with co-defendant Kirill Rapoport, also used extortionate means to collect debts that were owed to Azen from his own illegal gambling operation, including by the threat of force. PSR ¶ 29. At his guilty plea, the defendant allocated as follows:

> AZEN: At various times between 2006 and 2013, I agreed with others to collect monies that were owed by players at illegal poker games. It was understood that if the players did not pay this money, that force could be used to ensure payment. Many of the debts I sought to collect were from people in Manhattan. At the time I did this, I knew it was wrong.
>
> COURT: All right. And you participated in this conduct knowingly, understanding that the use of force was threatened or that the victim would understand that force might be used?

        AZEN:       Yes, sir.

Tr. 22.

For example, on October 5, 2012, FBI agents observed the defendant, Rapoport, and two mixed martial art ("MMA") fighters go to meet with a player in the defendant's poker games, who based on earlier interceptions appeared to be delinquent in paying the defendant debts from these games. Out of concern that Azen, Rapoport, and the MMA fighters might physically harm the player and in order not to reveal the ongoing FBI investigation, the FBI arranged for the New York City Police Department ("NYPD") to intervene in the meeting by claiming they had received a report of someone smoking marijuana in the area. FBI agents subsequently spoke to this poker player, who confirmed that he owed the defendant $35,000 to $40,000 in poker debts.

The FBI's investigation and surveillance of the defendant utilized wiretaps, including of October 5, 2012 conversations between Azen and Rapoport discussing going to shake down the gambler who owed Azen money. For example, at 12:11 p.m., Azen called Rapoport and told him, "Call the boys [the MMA fighters whom Rapoport brought to the shake down] and cancel everything. He [the gambler] said that he is busy until seven. He will call back and tell me where to meet him at seven or seven thirty." Rapoport, upset, answered, "Damn motherfucker."

Later on October 5, 2013, at approximately 7:25 p.m., Azen, Rapoport, and the MMA fighters arrived outside the gambler's apartment building. Rapoport, acting as a lookout, watched Azen and the MMA fighters approach the building. At 7:26 p.m., the gambler, understandably not wanting to go outside into the dark night with Azen, Rapoport, and their cronies, and also not wanting them to come into his apartment, texted Azen, "I am in the lobby." Azen then entered the lobby of the building, and out of Rapoport's view. At 7:27 p.m., Rapoport called Azen and said, "stand in front of the door. In front of the entrance. Here, in front of the entrance so I can see you from the boardwalk." At that moment, the NYPD intervened at the direction of the FBI.

The Government intercepted other calls in which Azen and Rapoport discussed gambling debts. For example, on September 12, 2012, at approximately 8:41 p.m., Rapoport complained to Azen that a certain client's debt was being calculated at such a low number. On September 26, 2012, at 1:28 p.m., Rapoport asked Azen if another identified client had paid up, and Azen responded that the client had done so.[2]

---

      [2]      On March 30, 2013, Rapoport was arrested for driving while intoxicated. At the time of his arrest, brass knuckles were found in his possession. At the time of his arrest on April 16, 2013 in this matter, brass knuckles were found in the defendant's dresser. An inoperable, black powder gun was also found in his apartment.

### The Plea and Applicable Guidelines Range

On November 5, 2013, the defendant pled guilty, pursuant to a plea agreement, to Counts Twelve and Nineteen of the Indictment. Count Twelve charged the defendant with participating in a money laundering conspiracy, from in or about 2006 through in or about April 2013, in violation of Title 18, United States Code, Section 1956(h). Count Nineteen charged the defendant him with participating in a conspiracy to collect extensions of credit by extortionate means, from in or about January 2012 through in or about April 2013, in violation of Title 18, United States Code, Section 894. In connection with the plea, the defendant also agreed to forfeit (1) a sum of money equal to $1,169,567.83 in United States currency, and (2) all right, title and interest of the defendant in the following specific property: (a) Various collectible coins seized from 426 Deisius Street, Staten Island, New York on April 16, 2013, and (b) $8,340.00 in United States currency seized from 426 Deisius Street, Staten Island, New York on April 16, 2013.

In its February 24, 2014 draft PSR, the Probation Department calculates a Guidelines range of 37 to 46 months' imprisonment (level 21). The Government agrees with this Guidelines calculation, although it notes that the plea agreement mistakenly calculated the applicable Guidelines range to be 30 to 37 months' imprisonment (level 19).

### The Appropriate Sentence

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the Guidelines range of 37 to 46 months' months' imprisonment is appropriate.

*First*, a substantial sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. The seriousness of the instant offense requires little elaboration. The defendant laundered hundreds of thousands of dollars of illegal gambling proceeds, representing the fruits of his own gambling business and those of the business run by Illya Trincher. In so doing, the defendant sought to conceal these proceeds from detection by the Government. This conduct included the defendant's agreeing to be a no-show plumber, which allowed Trincher to claim false business expenses on tax returns that he filed with the Internal Revenue Service.

What is more, the defendant personally visited those owing him debts, and, on at least one occasion, went with co-defendant Kirill Rapoport and MMA fighters to try to get a player to pay. The FBI believed that there was a real possibility that the player would get hurt, which was why they alerted the NYPD. Furthermore, and notably, at the time of the Rapoport's arrest, brass knuckles were found in his home; and when Rapoport was arrested in March 2013 (a month before his arrest in this case) for drunk driving, he was also carrying brass knuckles. These weapons are tools of the trade for an "enforcer" who threatens the use of force to collect debts. The Court's observations at Rapoport's sentencing are equally applicable here: "the fact that the defendant showed a willingness to use violence or threats of violence to me makes this conduct very different in kind from the conduct that I have sentenced [other defendants] for." Tr. 21.

*Second*, and relatedly, the Government believes that a Guidelines term of imprisonment is appropriate because the defendant is the most culpable defendant to be sentenced thus far in this case.  The defendant's criminality was pervasive and touched almost all aspects of the conduct in this Indictment.  The defendant ran illegal poker games and also ran an illegal sports gambling business with co-defendants Dmitry Druzhinsky, Alexander Zaverukha, and Alexander Kathaloff.  He also laundered hundreds of thousands of dollars from his own gambling business and from Illya Trincher's business.  And, significantly, he and others threatened the use of force to collect on gambling debts owed to him.  A substantial sentence is necessary to reflect the seriousness of this conduct, as well as afford adequate deterrence, and to protect the public from further crimes of the defendant.

Accordingly, the Government respectfully submits that a sentence within the Guidelines range of 37 to 46 months' imprisonment is appropriate.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/
Joshua A. Naftalis
Harris M. Fischman
Kristy J. Greenberg
Peter Skinner
Assistant United States Attorneys
(212) 637-2310 / 2305 / 2469 / 2601

cc:   Susan G. Kellman, Esq.